**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Teters, et al., | No. CV-19-05038-PHX-SPL |
| Plaintiffs, | |
| vs. | **ORDER** |
| Peoria Unified School District, | |
| Defendant. | |

At issue is an administrative law judge's denial of Plaintiffs' Due Process Complaint under the Individuals with Disabilities Education Act (IDEA), 20 USC § 1400. (Doc. 4). Plaintiffs filed a Complaint with this Court on behalf of themselves (hereinafter "Parents") as well as their minor son, P.T. (hereinafter "Student") seeking judicial review of that denial. (Doc. 1). The Court now considers Plaintiffs' Opening Brief (Doc. 20), Defendant Peoria Unified School District's Response/Answering Brief (Doc. 21), and Plaintiffs' Reply Brief (Doc. 25). The Court finds this matter appropriate for decision without oral argument. *See* LRCiv 7.2(f).

**I.     BACKGROUND**

On November 14, 2018, Plaintiffs first filed a Due Process Complaint with the Arizona Department of Education (ADE). (Doc. 1 at ¶ 19). Plaintiffs alleged that Defendant failed to provide a free appropriate public education (FAPE) to Student—who suffers from behavioral and learning disabilities—under the IDEA. (Doc. 1 at ¶ 19). Specifically, Plaintiffs challenged Student's "Individualized Educational Program (IEP) and

amendments adopted by Respondent School District," and alleged "predetermination regarding placement, a failure to collect data, a failure to conduct a Functional Behavioral Analysis (FBA), and a failure to develop a Behavior Intervention Plan (BIP)." (Doc. 4 at 2). As a result of these alleged violations, Parents unilaterally placed Student in a private special education school, AZ Aspire. (Doc. 1 at ¶ 18). Plaintiffs requested that Defendant pay tuition and related expenses for Student to attend AZ Aspire, as well as attorneys' fees and costs. (Doc. 1 at 10).

The ADE referred Plaintiffs' Due Process Complaint to the Arizona Office of Administrative Hearings for a hearing before an administrative law judge ("ALJ"). (Doc. 1 at ¶ 21). ALJ Tammy L. Eigenheer held a hearing on the Complaint over a three-day period—on February 7, 2018, February 8, 2018, and February 22, 2018—and issued a decision on July 30, 2019 denying the Complaint. (Doc. 4 at 2-3, 28).

On February 7, 2020, Plaintiffs filed a Complaint in this Court requesting a reversal of the ALJ decision. (Doc. 1). In their Opening Brief, Plaintiffs allege the ALJ erred by concluding that Student's IEPs and subsequent amendments to it were reasonably calculated to provide Student a meaningful educational opportunity. (Doc. 20 at 11). Plaintiffs request that this Court find that AZ Aspire is an appropriate placement and again seek tuition and attorneys' fees. (Doc. 20 at 28).

In this appeal, Plaintiffs allege there are various errors in the ALJ's decision such that the decision is not entitled to deference. Specifically, Plaintiffs argue the ALJ's decision "ignores key documentary and testimonial evidence, is inherently inconsistent and fails to apply relevant authority." (Doc. 20 at 13). Plaintiffs argue that the decision "erroneously ignore[s]," among other things, evidence of Student's lack of progress following the implementation of his IEPs and evidence that the IEP Teams did not sufficiently consider Student's inability to function on a large campus. (Doc. 20 at 14-16). Finally, Plaintiffs argue the ALJ "ignor[ed] the now well-established standard that mere *de minimis* progress is tantamount to no educational benefit and thus a denial of FAPE." (Doc. 20 at 13-14).

## II. LEGAL STANDARDS

### a. The IDEA

The IDEA requires that state educational agencies receiving federal funds provide special education services for children with qualifying disabilities. *See* 20 U.S.C. § 1400(d)(1)(A).[1] The IDEA requires that public school districts provide qualifying students a "basic floor of opportunity"; it does not require that the school maximize each child's potential. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 198–204 (1982); *accord J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010). A child receives a FAPE if the instruction "(1) addresses his unique needs, (2) provides adequate support services so he can take advantage of the educational opportunities and (3) is in accord with the [IEP]." *Park, ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir. 2006) (citing *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 893 (9th Cir. 1995)); *see also* 20 U.S.C. § 1401(9).

Once it is determined that a child is eligible for special education, a public school district must formulate and implement an IEP, which informs how the child will be educated in light of his particular needs that result from his disability. *See* 20 U.S.C. § 1414. A student's IEP must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. Under the IDEA, school districts are required to construct an IEP Team comprised of various school personnel as well as the student's parents to develop the IEP. 20 U.S.C. § 1414(d)(1)(B). Within a student's IEP are annual goals. *Id.* § 1414(d)(1)(A)(i)(I)(cc). The IEP Team must consider the strengths of the child, concerns of the parents, evaluation results, and the academic, developmental, and functional needs of the child. *Id.* § 1414(d)(3)(A). Additionally, the IDEA does not require placement in a particular school, but the IEP Team must consider alternative placements. *See* 34 C.F.R. § 300.116(d).

---

[1] Student has been diagnosed with conditions including "depression, anxiety, insomnia, migraines, executive functioning disorder, neurocognitive disorder due to prenatal toxin exposure, tic disorder, and reactive attachment disorder." (Doc. 4 at 3). The parties do not dispute Student's eligibility for special education and services under the IDEA.

**b. Standard of Review**

Under IDEA, an aggrieved party may bring a civil action in federal district court after receiving the final decision of an ALJ. *See* 20 U.S.C. § 1415(i)(2)(A). The party challenging the ruling bears the burden of proving the ALJ's decision was not met by a preponderance of the evidence. *Clyde K. v. Puyallup Sch. Dist.*, 35 F.3d 1396, 1399 (9th Cir. 1994), *superseded on other grounds as recognized in L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009). The district court "shall receive the records of the administrative proceedings," "shall hear additional evidence at the request of a party," and "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

The Court reviews *de novo* the question whether a school district's proposed IEP provided a FAPE but reviews the ALJ's findings of fact only for clear error. *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1118 (9th Cir. 2016). Mixed questions of law and fact are reviewed *de novo*, unless the question is primarily factual. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987). However, courts must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).

It is a matter of district court discretion to decide the degree of deference to give the ALJ's determination. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993). "[T]he fact-intensive nature of a special education eligibility determination coupled with considerations of judicial economy render a more deferential approach appropriate." *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 n.4 (9th Cir.2007). The Court gives particular deference to "thorough and careful" administrative findings. *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir.2007) (internal quotation marks and citation omitted).

///

///

## III. ANALYSIS

### a. Deference

The ALJ Decision is a twenty-eight-page order setting forth the witnesses, evidence, and issues at the hearing along with detailed findings of fact. (Doc. 4). In their Opening Brief, Plaintiffs list "critical evidence" which it alleges the ALJ "erroneously ignored." (Doc. 20 at 14-16). However, most of the evidence listed was in fact explicitly addressed in the ALJ's Decision.[2] Furthermore, the ALJ states she considered the entire record, including all the testimony and every exhibit, even if not specifically addressed in the Decision. (Doc. 4 at 5, n.6). That the Plaintiffs disagree with the ALJ's ultimate conclusions regarding such evidence is not a reason for this Court to accord the Decision less deference. Because the Court finds the ALJ was thorough and careful in her findings, the Court concludes they are entitled to significant weight. This Court will consider the issues in the order that Plaintiffs briefed them.

### b. February 2018 IEP

Plaintiffs first argue the ALJ erred in concluding that Student's February IEP was reasonably calculated to provide Student a FAPE. (Doc. 20 at 16). Plaintiffs set forth three arguments: (1) the ALJ erred in concluding the IEP provided a FAPE because there was "no substantive change" from the previous IEP; (2) the ALJ applied the wrong standard when evaluating Student's progress under the IEP; and (3) the ALJ erroneously ignored the Supreme Court mandate that school districts must revisit an IEP if expected progress is not occurring. (Doc. 20 at 16-21).

#### i.  *Facts*

Student began attending Defendant's school district in 2011, when Student was in the second grade. (Doc. 4 at 4). Due to Student's aggression and self-harming behavior,

---

[2] For example, Plaintiffs argue the ALJ erroneously ignored "Student's abysmal performance following the February [IEP]" as well as "Student's continued avoidance of classes following the February 2018 IEP." (Doc. 20 at 14). However, the ALJ specifically considered this evidence in her Decision. (Doc. 4 at 9, 22) ("Following the February 28, 2018 IEP Team meeting, . . . Student had failed both Algebra 1 and P.E. Further, Student made limited progress on his goals. . . . Student continued to struggle going to class and/or engaging in class once on campus.").

Student was placed in a self-contained behavioral support program, but returned to his home school in sixth grade. (Doc. 4 at 4-5). To prepare for starting high school, Student's IEP Team developed a "transition IEP" in March of 2017. (Doc. 4 at 5). In January of 2018, halfway through Student's freshman year, Defendant convened a "Review of Existing Data (RED)/Multi-disciplinary Evaluation Team (MET)" meeting to discuss Student's progress under the transition IEP. (Doc. 4 at 6). In February of 2018, the IEP Team had their annual meeting to discuss amending Student's IEP in response to the data collected regarding Student's progress. (Doc. 4 at 7). At the time of the annual meeting, Student was failing most of his classes. (Doc. 4 at 7).

To address Student's grades, the February 2018 IEP included the following math, social emotional, and general academic goals as related to the previous IEP:

(i) Increase Student's math word problem solving from 20% to 50% accuracy;

(ii) Increase Student's self-advocacy skills by meeting with a case manager and/or support staff at least weekly; and

(iii) Increase Student's coping skills by working with staff to identify and develop a plan to address challenges that interfere with his motivation and get him to attend and perform at school consistently.

(Doc. 4 at 7-8).

Additionally, Student was feeling "emotionally overwhelmed" with his schoolwork, causing him to avoid school altogether and express a desire to quit. (Doc. 4 at 8). To address these concerns, and to help meet Student's goals, the following new procedures and accommodations were implemented:

(i) Reduce Student's schedule from a full-time course load of four classes to a part-time course load of two classes;

(ii) Provide Student with 60 minutes per month of specialized instruction in math problem solving, 90 minutes per quarter in Behavioral Support with a psychologist (same as previous year), and 120 minutes per month of counseling by the behavioral health support system (an increase from 90 the

|   |       |                                                                                              |
|---|-------|----------------------------------------------------------------------------------------------|
|   |       | previous year);                                                                              |
|   | (iii) | Break tests/quizzes into sections to avoid overwhelming Student;                             |
|   | (iv)  | Reduce assignments/tests when Student is frustrated to focus on mastery of concepts only;    |
|   | (v)   | Have Student check in with staff to organize his work in a folder system;                    |
|   | (vi)  | Positively reinforce Student with positive comments and actions; and                         |
|   | (vii) | Grant Student access to resource lab for small group setting for all tests/assignments.      |

(Doc. 4 at 8-9), (Doc. 20 at 3).

    *ii.    ALJ Decision*

The ALJ found that, following the February IEP, Student's attendance "vastly improved." (Doc. 4 at 9). However, the ALJ acknowledged that at the close of the school year Student had failed the two classes he was taking and had made limited progress on his goals. (Doc. 4 at 9). Nonetheless, the ALJ held that the February IEP provided Student a FAPE because it was reasonably calculated to, and did in fact, reduce Student's anxiety such that he could attend school more, at least initially. (Doc. 4 at 23-24).

Specifically, the ALJ found that "the decision to reduce Student's class load in the short term was an appropriate response" because, since Student "could not access the general education curriculum" without attending school, "[g]etting Student to attend school was the most significant and pressing issue at the time of the February 2018 IEP." (Doc. 4 at 24). Thus, the ALJ reasoned that once Student improved on his attendance "the IEP Team would amend the IEP to add goals that the Student could then work towards." (Doc. 4 at 24). Finally, the ALJ found that Student's minimal progress following the IEP does not mean he was deprived a FAPE because "schools will not be found to have failed to provide FAPE because a student made only *de minimis* progress under an IEP. . . . [T]he question to be considered is whether the goals, as written, were appropriately ambitious in light of the student's unique circumstances." (Doc. 4 at 24) (citing *Rowley*, 458 U.S. at 192; *Van Duyn v. Baker School District 5J*, 502 F.3d 811, 815 (9th Cir. 2007)). In

conclusion, the ALJ held that Plaintiffs "failed to establish that the February 2018 IEP was not reasonably calculated to provide Student a meaningful educational opportunity." (Doc. 4 at 24).

   *iii.*  *Analysis*

At the outset, this Court rejects Plaintiffs' argument that the ALJ erroneously applied the *Rowley* "*de minimis*" standard. Plaintiffs assert that Student's *de minimis* progress (*i.e.*, initially attending school more often but then continuing to have difficulty attending and engaging in class) is not sufficient to support a finding that the IEP provided a FAPE. (Doc. 20 at 18-19). Plaintiffs assert that the more recent Supreme Court case, *Endrew F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988 (2017), heightened the standard in *Rowley* and requires that an IEP provide "more than trivial or minor educational benefit." (Doc. 20 at 18). Plaintiff's argument, however, is misplaced.

In *Rowley*, the Supreme Court held that if an IEP is "reasonably calculated to enable the child to receive educational benefits," a FAPE has been provided. *Rowley*, 158 U.S. at 207. Nearly forty years later in *Endrew F.*, the Supreme Court revisited the standard for a FAPE. *Endrew F.*, 137 S. Ct. 988. In reviewing *Rowley* and relevant statutory language, the Court held that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP *reasonably calculated* to enable a child to make progress *appropriate in light of the child's circumstances*." *Id.* at 999 (emphasis added). In so holding, the Court reiterated that a "bright line rule" focusing on the level of a student's *actual* progress under the IEP was not appropriate, but rather the scrutiny should be placed on the reasonable *goals* of the particular student's IEP. *See, e.g.*, *Rowley*, 458 U.S. at 203-204 ("[T]he IEP . . . should be reasonably *calculated* to enable the child to achieve passing marks and advance from grade to grade."); *Endrew F.*, 137 S. Ct. 999 ("The IEP must *aim to enable* the child to make progress." (emphasis added)).[3]

---

[3] Plaintiffs cite the following sentence from *Endrew F.* for the proposition that the scrutiny should be placed on Student's actual results under the IEP: "a student offered an educational program providing merely more than *de minimis* progress from year to year can hardly be said to have been offered an education at all." *Endrew F.*, 137 S. Ct. at 1000 (internal citations omitted). However, in the next few sentences of the opinion, the Court

8

The *Endrew F.* court went on to note that using this "snapshot rule" (*i.e.*, looking at the reasonableness of the District's IEP plan *at the time it was created*), rather than assessing its adequacy retroactively, requires deference to the school district's judgment:

> The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal.

*Id.* at 999 (internal citations omitted); *see also Baquerizo v. Garden Grove Unified Sch. Dist.*, 826 F.3d 1179, 1187 (9th Cir. 2016) ("When reviewing whether a proposed educational setting is 'appropriate,' we employ the 'snapshot' rule, which instructs us to judge an IEP not in hindsight, but instead based on the information that was reasonably available to the parties at the time of the IEP."). Thus, a student's progress (or lack thereof) after implementation of an IEP is not definitive evidence of a failure to provide a FAPE. *See, e.g.*, *Parenteau v. Prescott Unified Sch. Dist.*, No. CV 07-8072-PCT-NVW, 2008 WL 5214997, at *9 (D. Ariz. Dec. 11, 2008) ("The IDEA does not make the District a guarantor of each student's educational progress."); *J.B. by and through Belt v. District of Columbia*, 325 F. Supp. 3d 1, 9 (D.D.C. 2018) ("[W]hile *Endrew F.* clarified the appropriate legal standard for a challenge like this one, it certainly does not stand for the proposition that any time a child makes negligible (or uneven) academic progress, the school system has violated the IDEA."). The ALJ correctly applied this standard, and this Court will focus its analysis on whether the February 2018 IEP was reasonably calculated at its inception to provide Student a FAPE in light of his circumstances.

Plaintiffs first argue that the February IEP was inadequate because "there was

---

reiterates that the scrutiny must be placed on whether the IEP was reasonably *calculated* to result in progress, not whether it actually did: "For children with disabilities, receiving instruction that *aims* so low would be tantamount to sitting idly . . . awaiting the time when they were old enough to drop out." *Id.* (emphasis added) (internal quotation marks and citation omitted).

nothing included in the IEP that was designed to confer an educational benefit as it was unchanged from the previous year's IEP." (Doc. 20 at 17). Plaintiffs acknowledge, however, that Student's schedule was reduced in the IEP. (Doc. 20 at 16). Although there were additional changes made to the IEP, the ALJ focused on the reduction to Student's schedule and concluded the IEP was reasonable because "[g]iven Student's unwillingness or inability to attend class during the Spring 2018 semester, it is difficult to imagine appropriate social skills or peer interaction goals that could have been attempted to be implemented." (Doc. 4 at 23-24). In other words, the February IEP was reasonably calculated to provide Student an educational benefit because it was aimed solely on getting him to school. (Doc. 4 at 23-24) ("The desire was to reduce Student's anxiety to a point where he would be capable of attending school regularly, then transition back to a full schedule. . . . Getting Student to attend school was the most significant and pressing issue at the time of the February 2018 IEP."). Then, once Student started going to school more, the district could implement more substantive changes geared toward social skills, peer interaction, and anxiety. (Doc. 4 at 24) ("One would presume that if Student's willingness or ability to attend school, go to class, and engage in class improved during the IEP's effective time period, the IEP Team would amend the IEP to add goals that Student could then work towards.").

The fact that an IEP has only minor changes does not mean it does not provide a FAPE. *See J.B.*, 325 F. Supp. 3d at 9 ("[L]imited academic progress does not *ipso facto* signal a violation of the IDEA *any more so than does the existence of substantially similar IEPs year over year*." (emphasis added)). And the fact that Student ultimately failed the two classes he was taking does not necessarily mean the reduction in his course load was not reasonably calculated, at the time the plan was created, to help progress Student in school. It was certainly reasonable for Defendant to believe that having Student only take two classes, rather than four, would reduce his school aversion. *See D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 598 (2d Cir. 2005) ("[F]or an IEP to be reasonably calculated to enable the child to receive educational benefits, it must be likely to produce

progress, not regression." (citation omitted)). This is particularly true in light of Student's expressed desires to quit school altogether. This Court is persuaded that the most pressing issue with Student was getting him to physically attend school, a goal which the reduction of classes in the February IEP was reasonably calculated to attain before implementing more substantive changes. *See L.J. by N.N.J. v. Sch. Bd. of Broward Cty., Fla.*, No. 11-60772-CIV-MARRA, 2017 WL 6597516, at *26 (S.D. Fla. Sept. 28, 2017) ("Given [student]'s strong aversion to school, the Court cannot fault the School Board for failing to press [student] in the area of social skills."). Accordingly, that the IEP had relatively minor changes in its February iteration and did not prioritize the development of certain skills does not render it inadequate to provide a FAPE.

As their final argument regarding the February IEP, Plaintiffs argue the ALJ erred in "ignoring the Supreme Court mandate [in *Endrew F.*] that Districts must revisit IEPs if the expected progress is not occurring." (Doc. 20 at 19). Specifically, Plaintiffs cite the following portion of the Questions and Answers by the Department of Education interpreting the *Endrew F.* decision for the proposition that the District failed to provide a FAPE when they "did nothing" after Student continued to avoid classes following the February IEP:

> [I]f a child is not making expected progress toward his or her annual goals, the IEP Team must revise, as appropriate, the IEP to address the lack of progress. . . . If a child is not making progress at the level the IEP Team expected, despite receiving all the services and supports identified in the IEP, the IEP Team must meet to review and revise the IEP if necessary, to ensure the child is receiving appropriate interventions, special education and related services and supplementary aids and services, and to ensure the IEP's goals are individualized and ambitious.

(Doc. 20 at 20) (alternation in original).

As discussed above, the ALJ concluded that, if Student had more success attending school after the February IEP was implemented, the IEP Team would then reconvene to add substantive goals to the IEP. Plaintiffs allege, however, that the IEP Team should have revisited the February IEP to make needed changes once Student continued to hide out in

a teacher's office and refused to attend class. (Doc. 20 at 19-21). In other words, Plaintiffs argue that the ALJ had it backward—the *lack* of progress should have prompted an IEP Team meeting earlier than the one held in August.

The IDEA does require that the District "review, and where appropriate revise, each child's IEP *at least annually*." *Rowley*, 458 U.S. at 182 (emphasis added); *see also* 20 U.S.C. § 1414(d)(4)(A). Any review of an IEP beyond the required annual review is a matter of the district's discretion, as courts must avoid "substitut[ing] their own notions of sound educational policy for those of the school authorities which they review." *Endrew*, 137 S. Ct. at 1001 (quoting *Rowley*, 458 U.S. at 206). The Supreme Court has cautioned courts from "adopt[ing] the problematic role of education policymaker [by] dictat[ing] which pedagogical methods a school district must consider and to what degree they must be incorporated on an individualized, case-by-case basis." *Renee J. as Next Friend of C.J. v. Houston Indep. Sch. Dist.*, No. 17-20750, 2019 WL 211216, *4 (5th Cir. Jan. 16, 2019) (citing *Endrew*, 137 S. Ct. at 992–93; *Rowley*, 458 U.S. at 207); *see also Carlson v. San Diego*, 380 F. App'x 595, 597 (9th Cir. 2010) (citing *Rowley*, 485 U.S. at 208, and agreeing that questions of "proper methodology" should be left to the school district).

Here, there were three months left of the school year after the February IEP was implemented, and the IEP Team met the beginning of the next school year in August to discuss Student's progress, ultimately proposing multiple changes. To be sure, as explained in more detail below, many of the proposed changes were not implemented because Student did not return to school after the August IEP. However, when Student refused to go to school and try out the August amendment, the IEP Team convened yet again a mere twenty-one days later. New changes were not proposed during that September meeting, but only because Defendant still wanted to implement the August changes and address Students responses to them before thrusting even more changes upon Student. Defendant's IEP Team—comprised of members who know Student personally and have worked with him intimately—made a deliberate decision to limit the changes in his IEP to avoid overwhelming him even more. The Court will not fault Defendant for failing to implement

new changes when its strategic plan was to first assess Student's response to the changes already proposed.

In sum, this Court affirms the ALJ's holding that Plaintiffs "failed to establish that the February 2018 IEP was not reasonably calculated to provide Student a meaningful educational opportunity." (Doc. 4 at 24).

### c. August 2018 and September 2018 amendments

Plaintiffs next argue the ALJ erred in concluding that the August and September amendments to Student's IEP were sufficient to provide a FAPE. (Doc. 20 at 21). Specifically, Plaintiffs argue the ALJ "refused to acknowledge the overwhelming evidence . . . that Student's anxiety and resulting school refusal was due to the large campus." (Doc. 20 at 21). Essentially, Plaintiffs argue that Defendant's focus on getting Student to school was misplaced, because the sheer act of being at school caused Student's anxiety to worsen. Plaintiffs further argue that "[t]he most glaring flaw in the ALJ's decision is that she ignored all the District could have done" and that Defendant "failed and refused to consider an alternative placement eve[n] after a year of Student steadily regressing." (Doc. 20 at 25).

*i. Facts*

As discussed above, following the February IEP, Student's attendance initially improved but Student thereafter continued to show signs of school aversion by missing multiple days of school and spending other days in a teacher's office refusing to go to class. (Doc. 4 at 9). Parents requested a meeting with the school to address Student's ongoing issues, and in August 2018 the IEP Team reconvened. (Doc. 4 at 9). The Team discussed Student's anxiety and considered a number of strategies including "individual counseling," "small group to address social skills," and "folder system where the co-teachers in each of his classes [] identify the one assignment he should be focusing on." (Doc. 4 at 10).

Additionally, during the August IEP meeting the Team considered alternative school options, including homeschooling and private placement schools such as AZ Aspire Academy. (Doc. 4 at 11). However, the Team felt that homeschooling was not in Student's best interest because "it would not help Student deal with his anxiety or prepare him for

13

the workforce, trade school, or college." (Doc. 4 at 11). Regarding private placement like AZ Aspire, the Team was concerned about "the drastic jump from Student's current placement to a private day school." (Doc. 4 at 11). Dr. Katten, Student's private psychologist, also expressed concerns "about Student suffering psychological regression if he experienced a wholesale change of his educational environment." (Doc. 4 at 24). Nonetheless, Defendant "indicated they would look into the placement [at AZ Aspire] and whether purchase orders existed that would allow Student to be placed there." (Doc. 4 at 21). Additionally, before deciding to transfer Student to another school, the Team amended Student's February IEP.

The August amendment to Student's IEP included the following changes:

(i) Rearranging Student's schedule so the class with his "preferred teacher" was during his first period;

(ii) Doubling counseling services from 120 minutes per month to 240;

(iii) Adding 45 minutes per month of support services;

(iv) Moving Student to a more restrictive placement (restricting his time in general education classes);

(v) Adding accommodations for Student's sensory processing including allowing one earbud in, speaking only to Student's side, and allowing Student to communicate via email;

(vi) Adding an accommodation for physical movement; and

(vii) Allowing Student to enter the classroom before other students.

(Doc. 4 at 12, 24-25).

The Team and Parents agreed to meet again in September to evaluate Student's progress following the August amendment after collecting data on his response to it. (Doc. 4 at 12). However, following the August meeting, Parents were generally unresponsive and Student did not return to school, so the effectiveness of the amendment could not be considered. (Doc. 4 at 12-13). On September 8, 2018 Student's father emailed the school expressing concern about Student being "shut down" and requesting another

IEP meeting. But on September 12, before the requested September IEP meeting was held, Parents and Student toured AZ Aspire. (Doc. 4 at 14). At the September IEP meeting, Student's father recounted Student's positive reaction to AZ Aspire. (Doc. 4 at 14).

In response, at the September meeting the IEP Team proposed several options in an attempt to recreate the atmosphere at Aspire: "If we need to make that adjustment to a hybrid of any number of things: LSC courses, combined with e-campus, combined with some home instructions—whatever that needs to look like, we can make that happen." (Doc. 4 at 15). The IEP Team also suggested placing Student in Cactus High School, another public high school in the district roughly half the size of his current school, but Parents rejected that suggestion because they felt it would be too traumatic for Student to attend a school that housed other students who he went to elementary school with. (Doc. 4 at 14-15).[4] Additionally, before transferring Student, the Team still wanted to implement the August amendment to the IEP, collect data on Student's response, and reconvene in ten days to discuss (as was the plan before the AZ Aspire tour). (Doc. 4 at 15). However, before the ten-day trial of the August IEP was over, Parents unilaterally enrolled Student in AZ Aspire. (Doc. 4 at 16).

  *ii.*  *ALJ Decision*

Regarding the August amendments, the Team expressed concerns about changing to many aspects of the IEP, causing Student to "regress emotionally," so the Team agreed to only implement the above changes. (Doc. 4 at 24). The ALJ found that this decision, along with the decision to implement the changes only for one month and for the Team to reconvene and look at Student's progress before adding more changes, was reasonable.

---

[4] The Court finds that, during the 2018-2019 school year, Sunrise Mountain High School had 1,920 students enrolled and Cactus High School had 1,207 students enrolled, making Cactus High School about 63% the size of Sunrise Mountain. *See National Center for Educational Statistics*, available at https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?ID=040625000589 (Sunrise High School) (last visited Sept. 20, 2020); https://nces.ed.gov/ccd/schoolsearch/school_detail.asp?Search=1&DistrictID=0406250&ID=040625000508 (Cactus High School) (last visited Sept. 20, 2020). The ALJ's finding that Cactus High School is "roughly half the size of Sunrise" is therefore accurate. (Doc. 4 at 13).

(Doc. 4 at 25-26). The ALJ further held that, as a result of Student's failure to attend school after the August meeting, Defendant "could not collect data regarding the changes discussed [at the August meeting] and agreed upon during the meeting." (Doc. 4 at 22). The ALJ attributed Student's unwillingness to return to campus after the August IEP meeting, in part, to Parents' "ignor[ing] Respondent School District's attempts to engage Parents and Student to help get Student back on campus." (Doc. 4 at 26). Thus, the ALJ concluded that "the effectiveness of the changes could not be considered by the IEP Team." (Doc. 4 at 25).

Regarding the September amendments, in addition to considering alternative private placements, the ALJ found that the amendment offered "options, including e-campus courses, homebound instruction, counseling, and small classes, [that] were similar to those options available at AZ Aspire." (Doc. 4 at 25). The ALJ concluded that "[i]t is difficult to determine what accommodations and modifications Respondent School District could have offered that Petitioners would have deemed appropriate for Student absent a placement at Aspire." (Doc. 4 at 26). In sum, the ALJ held that Plaintiffs "failed to establish that the August 23, 2018 and September 13, 2018 amendments to the February 28, 2018 IEP were not appropriate." (Doc. 4 at 26).

   *iii.* *Analysis*

Plaintiffs argue that Defendant failed to consider alternative private school placement (specifically AZ Aspire) for Student. (Doc. 20 at 8-9) ("The District did not consider the small private school."). The ALJ did not specifically find that Defendant failed to consider the alternative placement altogether (although she did hold that Petitioners argued "Respondent School District should have *more seriously* considered the private day school placement," Doc. 4 at 25, implying they did consider it to some extent). Rather, the ALJ found that, before looking into alternative placement, Defendant "proposed that they implement the August 23, 2018 IEP for a short 10-day window, collect data, and hold an IEP review meeting on September 27, 2018 as previously scheduled to assess progress and consider further options, as needed." (Doc. 4 at 15). This was not in error.

16

First of all, Defendant did offer other accommodations to help limit Student's exposure to large class sizes. At the September meeting, Defendant proposed a variety of instructional methods that would limit Student's exposure to the large classes on campus (*i.e.*, home instruction, online courses, etc.), and also suggested another school within the district which had fewer students (Cactus High School). Plaintiffs offer no evidence that Student could not receive any educational benefit from the accommodations offered, or that he *required* placement at a special education school. Rather, Plaintiffs "criticized that the homebound instructor would not be the same instructor that would then teach Student should he return to the classroom on campus," and "rejected a move to Cactus High School, asserting that Student might run into students who also attended Pioneer Elementary behavior program with him and he would feel uncomfortable." (Doc. 4 at 14-15, 25).

While these solutions might not be *ideal* for Student, Plaintiffs fail to set forth any evidence that Student could not receive *some* educational benefit from these proposed changes. *Compare Gellert v. D.C. Pub. Schs.*, 435 F. Supp. 2d 18, 24 (D.D.C. 2006) ("Defendant argues that failure to include one requested accommodation, *i.e.* class size, should not render the IEP inappropriate. However, [Defendant] failed to present any evidence to establish that [the student] *could benefit* in his education without this specific accommodation, and failed to rebut any of Plaintiffs' evidence to the contrary. As such, Defendant failed to meet its burden of proof at the due process hearing that FAPE would be provided." (emphasis added) (internal citations and quotation marks omitted)) *with M.H. v. New York City Dep't of Educ.*, No. 10 CIV. 1042 (RJH), 2011 WL 609880, at *12 (S.D.N.Y. Feb. 16, 2011) ("The [ALJ] further noted that . . . the hearing record was devoid of evidence that [the student's] anxieties or perfectionism were affected by class size or evidence that [the student] would be *unable to function* in a class of twenty-five students. . . . The connection between [a student's school aversion] history and what class size is appropriate for a student with that history [] is exactly the sort of policy judgment on which . . . this Court should defer." (emphasis added)).

///

Furthermore, the Court finds that it was reasonable for Defendant to conclude it was in Student's best interest to first implement the changes in the IEP, in the general education atmosphere, and collect data before placing him in an even more restrictive environment. "[S]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). This "sets forth Congress's preference for educating children with disabilities in regular classrooms with their peers." *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. ex rel. Holland*, 14 F.3d 1398, 1403 (9th Cir. 1994). Here, the ALJ did not "turn[] a blind eye" to the evidence the Student was overwhelmed by the sheer size of the campus. (Doc. 20 at 22). Rather, she found that Defendant wanted to give Student another chance to face those fears and assimilate in a general population school, and she deferred to their judgment. *See Endrew*, 137 S. Ct. at 999-1000, ("[T]he IDEA requires that children with disabilities receive education in the regular classroom whenever possible. . . . [F]or most children, a FAPE will involve integration in the regular classroom . . . . The goals may differ, but every child should have the chance to meet challenging objectives."). This Court therefore affirms the ALJ's decision that the August and September amendments were reasonably calculated to provide Student a FAPE.

### ii. Tuition reimbursement

A parent or guardian is "entitled to reimbursement only if a federal court concludes both (1) that the public placement violated the IDEA, and (2) that the private school placement was proper under the Act." *Cty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996) (citing *Florence Cty. Sch. Dist. 4 v. Carter*, 510 U.S. 7 (1993)). "If both criteria are satisfied, the district court must then exercise its 'broad discretion' and weigh 'equitable considerations' to determine whether, and how much, reimbursement is appropriate." *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist*., 635 F.3d 1155, 1159 (9th Cir. 2011) (quoting *Carter*, 510 U.S. at 15–16).

Because this Court finds that the ALJ did not err in her conclusion that Student was provided a FAPE, the Court need not reach the issue of whether AZ Aspire is an appropriate alternative placement under the IDEA. Because Student was not denied a FAPE, Plaintiffs are not entitled to reimbursement from Defendant for electing to enroll Student in another more desirable private school.

Accordingly,

**IT IS ORDERED affirming** the July 30, 2019 decision of the Administrative Law Judge (Doc. 4).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly and terminate this case.

Dated this 30th day of September, 2020.

Honorable Steven P. Logan
United States District Judge